# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ELIZABETH A. RECUPERO and RAY MORRISON, Derivatively on Behalf of OSIRIS THERAPEUTICS, INC., 31 Marron Ave. Stoughton, MA 02072 | Case No: 1:17-cv-00381-JKB |
| Plaintiffs, | **AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| PETER FRIEDLE, c/o Osiris Therapeutics, Inc. 7015 Albert Einstein Dr. Columbia, MD 21046 | |
| YVES HUWYLER, c/o Osiris Therapeutics, Inc. 7015 Albert Einstein Dr. Columbia, MD 21046 | |
| JAY M. MOYES, c/o Osiris Therapeutics, Inc. 7015 Albert Einstein Dr. Columbia, MD 21046 | |
| THOMAS M. BRANDT, c/o Osiris Therapeutics, Inc. 7015 Albert Einstein Dr. Columbia, MD 21046 | |
| Defendants, | |
| and | |
| OSIRIS THERAPEUTICS, INC. 7015 Albert Einstein Dr. Columbia, Howard County, MD 21046 c/o The Corporation Trust Inc. 351 West Camden Street Baltimore, MD 21201, | |
| Nominal Defendant. | |

Plaintiffs Elizabeth A. Recupero and Ray Morrison ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Osiris Therapeutics, Inc. ("Osiris" or the "Company"), submit this Amended Verified Shareholder Derivative Complaint (the "Complaint").   Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Osiris with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Osiris against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, gross mismanagement and unjust enrichment that occurred between May 12, 2014 to the present (the "Relevant Period") and have caused substantial harm to Osiris.

2.     Osiris was incorporated in 1992 and is based in Columbia, Maryland.

3.     Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational and financial information.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company overstated revenues from several contracts and failed to follow the generally accepted accounting principles ("GAAP") standards and causing millions in losses to the Company; and (ii) as a result of the foregoing, the Company's public statements were materially false and misleading.

4.     On November 16, 2015, the Company disclosed that it had "determined to correct the revenue recognition for three (3) contracts which will result in a decrease in product revenues

2

of $1.8 million in the first quarter of 2015, a decrease in product revenue of $1.0 million in the second quarter, an increase in product revenues of $0.8 million in the third quarter of 2015 and a decrease in product revenues of $1.1 million in 2014." The Company restated figures from its 2014 Form 10-K and Forms 10-Q for the quarters ended March 31, 2015 and June 30, 2015. These restatements removed over $3 million of sales and shifted another $3.9 million in sales between the quarters.

5.     The Company also disclosed that it had a material weakness in internal control over financial reporting and that its disclosure controls and procedures were not effective for each of the affected quarters. The announcement came after the Company had previously disclosed in its Form 10-Q for the quarter ending September 30, 2015 that it had undertaken a review of the timing of revenue recognition under contract with distributors.

6.     On November 17, 2015, the Company's shares fell over 20% to close at $10.97 per share. The Company's share price never recovered from the loss of trust created by Defendants' false and/or misleading statements.

7.     In December 2015, the Company announced that its independent auditor, BDO USA, LLP ("BDO") resigned and "advised that their opinion on the effectiveness of the Company's internal controls over financial reporting as of December 31, 2014 should no longer be relied upon due to management's identification of a material weakness in internal controls over financial reporting related to the timing of revenue recognition under certain distribution contracts."

8.     The fallout at the Company continued, as Lode Debrabandere abruptly resigned as Chief Executive Officer ("CEO") in February 2016. Debrabandere's departure followed that of Philip R. Jacoby Jr. who had resigned as the Company's Chief Financial Officer ("CFO") in

September 2015.

9.     On March 15, 2016, it was disclosed that the SEC is conducting a non-public investigation relating to the Company's historic accounting practices.

10.     On May 27, 2016, the Company disclosed that it is the subject of a criminal investigation by the. U.S. Attorney's Office for the Southern District of New York.  The U.S. Attorney's investigation is in connection with the Company's historic accounting practices.

11.     The Company has been damaged as a result of Defendants' knowing breaches of fiduciary day and other misconduct.

## JURISDICTION

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between Plaintiffs and each defendant, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.   This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### A.  Plaintiffs

15.    ***Plaintiff Elizabeth A. Recupero*** ("Plaintiff Recupero") is, and was at relevant times, a shareholder of Osiris.  Plaintiff Recupero purchased her Osiris shares on February 21, 2014 and still holds her shares as of the date of the filing of this amended derivative Complaint and plans to retain these shares throughout the duration of the litigation.  Plaintiff Recupero will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Recupero is a citizen of Massachusetts.

16.    ***Plaintiff Ray Morrison*** ("Plaintiff Morrison") is, and was at relevant times, a shareholder of Osiris.  Plaintiff Morrison purchased shares of Osiris on August 23, 2013 and still holds some of his shares as of the date of the filing of this amended derivative Complaint and plans to retain these shares throughout the duration of the litigation.  Plaintiff Morrison will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Illinois.

### B.  Nominal Defendant

17.    ***Nominal Defendant Osiris Therapeutics, Inc***. is a Maryland corporation with its principal executive offices located at 1715 Albert Einstein Dr., Columbia, Maryland, 21046.

### C.  Director Defendants

18.    ***Defendant Peter Friedli*** ("Friedli") was one of the Company's co-founders and has served on the Board as a Director ("Board") from January 1996 to the present, aside from a brief period between February and June 2004.  He currently serves as Chairman of the Board of Friedli Corporate Finance, Inc. ("FCF"), a Swiss venture capital firm at which Fiedli serves as Principal, has been the primary source of financing for the Company throughout its lifetime.  As evidenced

by the Company's 2015 Definitive Proxy Statement, Friedli is the beneficial owner of 14,810,455 shares of Osiris stock, representing approximately 43% of the Company's outstanding stock with a value of over $213 million.  Upon information and belief, Friedli is a citizen of Switzerland.

19.     *Defendant Jay M. Moyes* ("Moyes") has served on the Board since 2006 and is currently as Chairman of the Audit Committee, a member of the Nominating Committee, and a member of the Compensation Committee.  Upon information and belief, Moyes is a citizen of Utah or Nevada.

20.     *Defendant Yves Huwyler* ("Huwyler") has served on the Board since June 10, 2015 and is currently as a member of the Audit Committee, Chair of the Nominating Committee, and Chair of the Compensation Committee.  Huwyler was a Director at Friedli Corporate Finance until 2012.  According to the Company's 2015 Proxy, Defendant Huwyler beneficially owned 51,072 shares of Osiris stock, worth approximately $735,436.  Upon information and belief, Huwyler is a citizen of Switzerland.

21.     *Defendant Thomas M. Brandt* ("Brandt") has recently been elected to the Board in 2016.  Brandt is a member of the Audit Committee.  Upon information and belief, Brandt is a citizen of Maryland.

22.     According to the Company website, there are only four members of the Board.  *See* http://investor.osiris.com/directors.cfm. (last visited on February 7, 2017).

**<u>Non-Parties</u>**

23.     Lode Debrabandere ("Debrabandere") served as the Company's President and CEO from December 2011 and as a Director from January 2014 until February 3, 2016 when his resignation from all three positions was announced.  Debrabandere was nominated to the Board in January 2014.  On February 3, 2016, Debrabandere abruptly resigned as a Company Director and

the Company's Chief Executive Officer and President, and now serves as a consultant to the Company.   According to the 2015 Definitive Proxy Statement ("2015 Proxy"), Debrabandere beneficially owned 238,750 shares of Company stock, worth approximately $3,438,000.   The Company paid Debrabandere in salary, stock awards and other compensation of $1,705,500 in 2014, $506,750 in 2013 and $392,250 in 2012.   Debrabandere (a) directed that Osiris substitute product Distributor B (defined below) had not ordered for the first quarter 2015 transaction; (b) made large sales of product to Distributor D (defined below) without notifying the Auditor of the agreement that Osiris would not pursue collection of payments until Distributor D made sales to end-users; (c) knew of a side agreement with Distributor D and Distributor E (defined below), whereby Distributor E took over Distributor D's delinquent payment obligations in September 2015, without disclosing the agreement or its implications to the Auditor; (d) knew about the improper and unsupported accounting entries as detailed herein, and the manner in which they were booked; (e) failed to disclose to investors Osiris' true financial condition; (f) signed the management representation letter to Osiris' Auditor for the first, second, and third quarters of 2014 and 2015 and the year ended 2014, which contained material false and misleading statements and omissions; and (g) signed Osiris' Form 10-K for the fourth quarter and year ended December 31, 2014.

24.     Dwayne Montgomery ("Montgomery") served as the Company's Chief Business Officer from September 2015 to February 3, 7016 when he was appointed Interim CEO upon Debrabandere's departure.  On March 3, 2016, he was appointed President and CEO and elected to the Board.  On June 10, 2016, Montgomery's resignation as President, CEO, and Director was announced and was replaced by David A. Dresner ("Dresner") in his capacities as President and CEO.   Montgomery substantially assisted the scheme described herein by engaging in the

following deceptive conduct: (a) purporting to arrange a sale to Distributor B (defined below) for the third quarter of 2015, (b) creating a false and backdated letter purporting to document the sale, and (c) indirectly providing the document to the Auditor.

25.     Philip R. Jacoby, Jr. ("Jacoby") served as the Company's Chief Financial Officer ("CFO") until September 17, 2015.   Jacoby continued in the employ of the Company as its Principle Accounting Officer and to assist with the transition of the new CFO.   According to the 2015 Proxy, Jacoby beneficially owned 76,681 shares of Company stock, worth approximately $1,104,206.  The Company paid Jacoby in salary, stock awards and other compensation $244,329 in 2014, $307,333 in 2013, and $265,000 in 2012.  During the Relevant Period, Jacoby sold 35,947 shares of artificially inflated Company stock for proceeds of $617,062.  Jacoby (a) created and backdated a false document regarding the fourth quarter 2014 transaction with Distributor A and caused the backdated and false document to be provided to the Auditor; (b) caused Osiris to store and pay for Grafix that Distributor B had not ordered for the first quarter 2015 transaction; (c) caused Osiris to book $1.9 million in revenue in the third quarter of 2015 related to purported transactions with Distributor B when Distributor B had not requested additional product in the third quarter, had not obtained regulatory approval to import any product, and had not yet purchased the product Osiris was storing in connection with the first quarter 2015 transaction; (d) ignored information from Distributor C that showed that Distributor C was not selling product at the price or quantity Osiris used to record revenue, and told the Auditor that Osiris did not receive this information prior to the third quarter of 2015; (e) accepted a side agreement with Distributor D and Distributor E, whereby Distributor E took over Distributor D's delinquent payment obligations in September 2015, without disclosing the agreement or its implications to the Auditor; (f) falsely represented to the Auditor that there was no relationship between Distributor E and

8

Distributor D and that Distributor D was an end-user of Osiris' products; (g) knew, recklessly failed to understand, and should have known about the above-referenced improper and unsupported accounting entries as detailed above, and the manner in which they were booked; (h) failed to disclose to investors Osiris' true financial condition; (i) signed the management representation letter to Osiris' auditor for the year ended 2014 and the first, second, and third quarters of 2015, which letters contained material false and misleading statements and omissions; (j) provided to Osiris' accounting consultant and Auditor accounting memos regarding Distributors A and C that included false and misleading statements and material omissions; (k) signed Osiris' Form 10-K for the year ended 2014 and Forms 10-Q for the first, second, and third quarters of 2015 and Osiris' Forms 8-K filed on March 5, 2015, May 8, 2015, and August 5, 2015; and (l) in May 2015, profited by selling stock at inflated prices.

26.     Gregory Law ("Law") served as the Company's Vice President of Finance and Principal Accounting Officer since November 17, 2014.  Effective September 17, 2015, Law became the Company's CFO, Corporate Secretary and Treasury.  The Company paid Law a base salary of $220,000 in 2015 and 2014.  Law (a) caused Osiris to book $1.9 million in revenue in the third quarter of 2015 related to purported transactions with Distributor B when Distributor B had not requested additional product in the third quarter, had not obtained regulatory approval to import any product, and had not yet purchased the product Osiris was storing in connection with the first quarter 2015 transaction; (b) ignored information from Distributor C that showed that Distributor C was not selling product at the price or quantity Osiris used to record revenue, and told the Auditor that Osiris did not receive this information prior to the third quarter of 2015; (c) knew of a side agreement with Distributor D and Distributor E, whereby Distributor E took over Distributor D's delinquent payment obligations in September 2015; (d) knew about the above-

referenced improper and unsupported accounting entries as detailed above, and the manner in which they were booked; (e) failed to disclose to investors Osiris' true financial condition; (f) signed the management representation letter to Osiris' auditor for the year ended 2014 and the first, second, and third quarters of 2015, which contained material false and misleading statements and omissions; (g) provided to Osiris' accounting consultant and Auditor accounting memos regarding Distributors A and C that included material false and misleading statements and material omissions; and (h) signed Osiris' Form 10-K for the year ended 2014 and Forms 10-Q for the first, second, and third quarters of 2015 and Form 8-Ks filed on November 6, 2015 and November 20, 2015.

## CODE OF BUSINESS CONDUCT AND ETHICS

27.     As members of Osiris' Board, Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

28.     The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Osiris, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

29.     The Audit Committee assists the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, audited and reporting practices of the Company and such other duties as directed by the Board.  The Audit Committee's role includes a particular focus on the qualitative aspects of financial reporting to the Company's stockholders as well as the Company's internal control over such financial reporting, the Company's processes to manage

business and financial risk and compliance with significant applicable legal, ethical and regulatory requirements. The Audit Committee is responsible for providing an avenue of communication among the independent auditors, management and the Board. The Audit Committee is directly responsible for the appointment, compensation, and oversight of the public accounting firm engaged for the purpose of preparing or issuing an audit report or related work. In addition, the Audit Committee is responsible for pre-approving all permissible non-audit services and for pre-approving all audit, review and attest engagements that are provided to the Company by its independent auditors.

30.     Pursuant to the Audit Committee Charter, the Audit Committee's responsibilities are:

> Review and reassess the adequacy of [the] Charter at least annually. Submit the Charter to the Board for approval and have the Charter published at least every three years or as otherwise required by SEC Rules and the Listing Standards.

> Review the Company's annual audited financial statements and management's discussion and analysis of financial condition and results of operations ("MD&A") prior to filing or distribution. The review should include discussion with management and the independent auditors of significant issues regarding the quality of the Company's accounting policies and principles as applied in its financial reporting, including any changes in the Company's selection or application of accounting principles, practices, judgments, audit adjustments and significant estimates, accruals and reserves. Based on that review, the Committee shall make a recommendation to the Board as to whether or not the financial statements should be included in the Annual Report on Form 10-K.

> Review and discuss with management and the independent auditors the Company's internal controls report and the independent auditor's attestation report prior to the filing of the Company's Annual Report on Form 10-K.

> Review earnings releases with the Chief Financial Officer and the independent auditors prior to dissemination, and, in particular, discuss non-GAAP information guidance.

> Prior to filing periodic reports with the SEC, review and monitor with the

Chief Financial Officer and the independent auditors:

- Management's disclosures to the Committee under Section 302 of the Sarbanes-Oxley Act of 2002;
- The contents of the officer's certifications required by applicable law to be included with or in the Company's periodic reports filed with the SEC and establish a procedure for being notified if such certifications are not included for any reason;
- Financial information and MD&A;
- Significant issues and transactions; and
- Significant changes in operations.

Review with the Chief Financial Officer any significant changes to generally accepted accounting principles.

Periodically review with the Chief Financial Officer and the independent auditors:

- The adequacy of the Company's internal controls, including information technology controls and security.
- The adequacy of disclosure controls and procedures.
- Any significant issues or findings and recommendations of the independent auditors together with management's responses thereto.
- The adequacy of disclosures about changes in internal controls over financial reporting.

Periodically inquire with the Chief Financial Officer and the independent auditors about significant risks and assess the steps management has taken to mitigate such risks.

Provide active oversight over management's anti-fraud program.

Approve all related party transactions, as defined by applicable Listing Standards, to which the Company is a party.

## DUTIES OF DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Osiris, Defendants owed Osiris and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Osiris in an honest and

lawful manner.  Defendants were and are required to act in furtherance of the best interests of Osiris and its investors.

33. Each director of the Company owes to Osiris and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

33. To discharge their duties, the officers and directors of Osiris were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Osiris were required to, among other things:

(a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)   conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate

system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Osiris conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Osiris, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

35.     Osiris researches and develops biosurgery solutions, focusing on "products for

wound care, cartilage repair, and orthopedics, to harness the ability of cells and novel constructs to promote the body's natural healing."

36.     Osiris was incorporated in 1992 and is based in Columbia, Maryland.  Its shares trade on the NASDAQ under the ticker symbol "OSIR".

**B.**     **Criminal Charges Against the Company's CFO by the United States of America**

37.     According to the Information filed by the United States of America in the action entitled *United States of America v. Philip Jacoby*, Case 1:17-cr-00676-DLC (S.D.N.Y.), the United States Attorney charged the following:

(a)     "From in or about 2008 up to and including in or about September 2015, PHILIP JACOBY . . . held the position of Chief Financial Officer ('CFO') of Osiris.  From in or about September 2015 through in or about January 2016, JACOBY held the position of Principal Accounting Officer.  During the period that JACOBY was the CFO of Osiris, he signed Osiris's quarterly and yearly financial reports that were required to be filed with the United States Securities and Exchange Commission ('SEC')";

(b)     "From at least in or about 2014, Osiris management was focused on the company's 'top line,' or gross revenue growth and, in particular, on being able to demonstrate quarter-over quarter revenue growth.";

(c)     "For example, a former CEO of Osiris (the 'CEO') regularly prepared internal presentations emphasizing the company's historical quarter-over-quarter revenue growth and emphasizing the need to achieve future growth.

(d)     "Similarly, in public earnings calls run by the CEO and in its earnings press releases, the Company touted the Company's revenue performance and quarter-over-quarter revenue growth."

(e)       "Between approximately 2010 and approximately 2015, Distributor-1 was a distributor for Osiris's Ovation product, among other products.  Distributor-1 was owned in its entirety by a sole principal ('Owner-1')";

(f)       "In or about September 2013, the Food and Drug Administration ('FDA') informed Osiris that Ovation failed to meet certain regulatory requirements and thus required pre-marketing approval from the FDA, which Ovation did not have.  Thereafter, Osiris agreed with the FDA that it would not sell Ovation after December 31, 2014."

(g)       "In order to maintain access to Ovation following December 31, 2014, Distributor-1 agreed to take possession of a significant quantity of Ovation prior to December 31, 2014 and by December 2014 was in possession of approximately $1.8 million worth of Ovation.  Because Distributor-1 lacked the ability to pay for such a large purchase, the Ovation was shipped to Distributor-1 on consignment.  Because the product was on consignment, Osiris could not properly recognize revenue until Distributor-1 had sold the product to an end user or Distributor-1 otherwise agreed to purchase the product."

(h)       "In or about December 2014, PHILIP JACOBY, . . . requested that Owner-1 convert some or all of the consigned inventory to inventory owned by Distributor-1 by December 31, 2014.  To the extent other revenue recognition criteria were satisfied, and the agreement was completed by December 31, 2014, this arrangement would have allowed Osiris to recognize revenue for that product in the fourth quarter of 2014."

(i)       "Notwithstanding internal pressure to make sales, however, PHILIP JACOBY . . . and Owner-1 did not reach a final agreement regarding the conversion of the consigned inventory until at least in or about January 2015.  For example:"

(1)       "On or about December 23, 2014, the CEO emailed JACOBY and

others saying that, 'Q4 is becoming a big challenge.  It's not good' and complaining that Osiris was only at about $18.5 million in revenue for the quarter, which the CEO said represented no growth.  The CEO asked JACOBY to confirm that Osiris would 'add about $1 million transfer fee from Ovation.'"

(2)    "On or about December 23, 2014, JACOBY emailed Owner-1 and said that 'most importantly' JACOBY wanted to 'chat' with Owner 1 about 'converting the consignment inventory into [Distributor-1] owned product and the related payment terms' and wanted to 'convert much/most of the Ovation consignment sales into sales in Q4 2014 and want [Owner-1's] thoughts and your suggestions on payment terms.'  Owner-1 did not respond to the email at any point in December 2014."

(3)    "On or about December 31, 2014, the final day of the fourth quarter, JACOBY and the CEO exchanged the following text messages:"

CEO: Did you speak to [Owner-1]?

JACOBY:  I sent her a note but haven't heard back from her yet – I'll try again tomorrow.  My guess is that her family is in [a vacation location] for the holidays.  I also sent a note to [another individual] before Christmas and haven't heard anything from him - looks like that one won't be easy . . . .

CEO: . . . I just wanted to be sure that we can take care of the Q with [Owner-1].  I assume that it will be OK, but hate to 'assume.'  Do you want me to reach out today?

JACOBY: [Owner-1] and I shared txt this morning – we'll talk on Friday but all should be good.

CEO: Ok. Thx.  Let's finalize the numbers next week.  Q4 = $20.2 million is what good looks like to me.

(4)    "JACOBY and OWNER-1 did not communicate by email or telephone again until on or about January 5, 2015, when JACOBY emailed Owner-1 saying, 'I'd like to convert roughly $1.2 million of the Consignment Inventory to sales as of 31Dec2014 . . . Give some thought to payment terms on the Ovation sales and let's discuss to wrap this up.'  JACOBY and Owner 1 spoke by phone that same day."

(5)    "On or about January 8, 2015, JACOBY and Owner-1 again communicated by email and JACOBY again asked Owner-1 to confirm the payment schedule for the conversion of the consigned inventory."

(j)    "Despite the fact that no agreement was reached in 2014, Osiris, at the direction of PHILIP JACOBY . . . booked approximately $1.1 million in revenue related to the conversion of consignment product in the fourth quarter of 2014 (the 'Distributor-1 Transaction')";

(k)    "In or about October 2015, the Company's auditors (the 'Auditors'), in connection with an inspection by the Public Company Accounting Oversight Board (the 'PCAOB'), requested additional documentation and information supporting Osiris's recognition revenue in December 2014 pursuant to the Distributor-1 Transaction.  In an effort to deceive the Auditors and the PCAOB, PHILIP JACOBY, . . . provided or caused to be provided false, inaccurate and misleading information to the Auditors."

(l)    "For example, in or about October 2015, PHILIP JACOBY, . . . and others prepared a memorandum from Osiris to its Auditors attempting to justify the recognition of $1.1 million of revenue from the Distributor-1 Transaction in the fourth quarter of 2014. In the memorandum, JACOBY falsely represented that on December 31, 2014, JACOBY

18

had 'discussed the sale terms with [Owner-1] via a conference call, and [Owner-1] agreed to purchase 933 units of Ovation for $1,072,950.'  As JACOBY well knew, no telephone call had taken place on December 31, 2014."

      (m)    "Similarly, on or about November 5, 2015, PHILIP JACOBY, . . . created a letter, backdated to December 29, 2014, purporting to memorialize an agreement between Osiris and Distributor-1 (the 'Jacoby Fraudulent Document').  That same day, JACOBY used his personal email account to send an email to Owner-1 stating:"

> attached is something that I think you should find and send to me in an email saying you had this in your file from late last year, and just came across it - and that it does memorialize our several phone conversations . . . Call me if necessary, but write a wonderfully warm and convincing email, please send it to my Osiris email.

      (n)    "Owner-1 complied and sent the Jacoby Fraudulent Document to the Osiris email account of PHILIP JACOBY . . . .   JACOBY then forwarded Owner-l's email containing the Jacoby Fraudulent Document to the CEO and the then-CFO of Osiris, who forwarded the document to the Auditors."

38.    On February 5, 2018, Philip Jacoby pleaded guilty to a charge of "False Statement to Auditors, 15 U.S.C. §§ 87m and 78ff.

## C.    <u>The SEC Action Against Osiris and its Officers</u>

39.    On November 2, 2017, the SEC filed a complaint entitled *SEC v. Osiris Therapeutics, Inc., et al.*, Case 1:17-cv-03230-CCB (D. Md.) (the "SEC Complaint").  The SEC Complaint named as defendants the following: (a) Osiris Therapeutics, Inc.; (b) Phillip R. Jacoby, Jr. (the Company's Chief Financial Officer ("CFO") until he became the Company's Principal Accounting Officer ("PAO") in September 2015); (c) Gregory I. Law (the Company's Vice

President of Finance and PAO from November 2014 until September 2015 when he became the

Company's CFO); (d) Lode B. DeBrabandere (the Company's CEO); and (e) Bobby Dwayne

Montgomery (the Company's General Manager of orthopedics and sports medicine from April

2014 to September 2015 and Chief Business Officer from September 2015 to February 2016).

40.     The SEC Complaint stated in relevant part:

(a)     "Osiris' lack of internal controls and the fraudulent conduct of the

Defendants resulted in Osiris' misstating revenue with respect to numerous of its

distributor and sales agent relationships in 2014 and 2015."

(b)     "The fraud at Osiris began to come to light during the third quarter of 2015

when Osiris' Auditor requested additional information regarding Osiris' recognition of

revenue.  On November 16, 2015, Osiris filed its Form 10-Q for the third quarter of 2015

and, within that filing, disclosed a material weakness in internal controls over financial

reporting and restated certain transactions that are detailed below.  In a Form 8-K filed on

November 20, 2015, Osiris disclosed that it would be restating its financial statements for

the first and second quarters of 2015 due to material errors, and in a Form 8-K filed on

December 17, 2015, Osiris disclosed that its Auditor intended to resign."

(c)     "In 2014 and early 2015, Distributor A was a distributor of Osiris products.

Based on the conduct of Jacoby and Law, Osiris improperly and prematurely recognized

revenue on its Ovation product that it purportedly sold to Distributor A in the fourth quarter

of 2014 and the first quarter of 2015."

(d)     "Also, in connection with the Auditor's 2014 audit and third quarter 2015

review of Osiris' financial statements, both Jacoby and Law made false and misleading

representations and material omissions regarding transactions with Distributor A."

(e)      "Further, […] in November 2015, Jacoby backdated a letter that was provided to the Auditor to cover up his fraudulent recognition of revenue in Osiris' published financial statements."

(f)      "In the fourth quarter of 2014, Jacoby and Law caused Osiris to improperly recognize revenue of approximately $1.1 million in connection with a purported sale of Ovation to Distributor A."

(g)      "During December 2014, Debrabandere set and communicated a fourth quarter 2014 revenue target of 'an absolute minimum $20 million,' noting that Osiris had increased revenue by millions of dollars each of the previous quarters."

(h)      "At this time, a significant amount of Osiris' Ovation inventory was consigned to Distributor A.  To meet the revenue target, Debrabandere and Jacoby hoped that Distributor A would purchase approximately $1 million of the consigned inventory."

(i)      "On December 23, 2014, Jacoby emailed Distributor A, writing:"

> We need to chat about a bunch of things, including … most importantly, converting the consignment inventory into [Distributor A] owned product and the related payment terms. I'm hoping to convert much/most of the Ovation consignment into sales in Q4-2014 and want your thoughts and your suggestions on payment terms.

(j)      "On January 5, 2015, Jacoby followed up with Distributor A in an email with the subject 'Open Items,' stating, 'I'd like to convert roughly $1.2 million of the Consignment Inventory to sales as of 31Dec2014 …. Give some thought to payment terms on the Ovation sales and let's discuss to wrap this up.'  Three days later, in a January 8, 2015 email on which Law was copied, Jacoby stated that he continued to negotiate terms for the large order with Distributor A."

(k)     "On January 13, 2015, Jacoby and Distributor A finally reached agreement as to the terms of the sale, with Distributor A agreeing to buy approximately $1.7 million in Ovation and to make anticipated monthly payments over the course of more than a year. Distributor A's email correspondence with Jacoby also indicated that Distributor A's anticipated payments were based on Distributor A's ability to sell Osiris' products to end-users."

(l)     "On February 2, 2015, with Jacoby's knowledge, Osiris further amended the sale to Distributor A to reclassify over $600,000 in Ovation back to consignment as of December 31, 2014.   As a result, Osiris' books and records reflected a sale of approximately $1.1 million to Distributor A as of December 31, 2014."

(m)     "Despite Jacoby and Law knowing that the sale terms were not finalized until 2015, Osiris recognized $1.1 million in revenue for the fourth quarter of 2014."

(n)     "Osiris' recognizing the $1.1 million in revenue during the fourth quarter of 2014 did not comply with GAAP.  First, because the terms of the sale were not finalized until at least January of 2015, persuasive evidence of an arrangement did not exist in 2014, and the revenue was not realized, realizable, or earned.  Additionally, because Distributor A's ability to pay Osiris was contingent upon its ability to sell to end-users, the price was not fixed or determinable, and the revenue was not realized, realizable, or earned."

(o)     "On or about March 23, 2015, in email correspondence that included Law, Jacoby explained that Distributor A would be purchasing its remaining consigned inventory of Ovation.  The purchase price of this product was approximately $800,000."

(p)     "Despite the fact that Distributor A's ability to pay Osiris remained contingent upon its ability to sell-through to end-users, Osiris recognized approximately

$800,000 in revenue for the first quarter of 2015."

(q)     "Osiris' recognizing this revenue during the first quarter of 2015 did not comply with GAAP because the price was not fixed or determinable, and the revenue was not realized, realizable, or earned."

(r)     "On or about March 20, 2015 and May 11, 2015, Jacoby and Law signed letters to the Auditor in connection with the Auditor's 2014 audit and first quarter 2015 review of Osiris' financial statements.  These letters are often referred to as management representation letters.  Through both of these letters, as well as their other interactions with the Auditors during the 2014 audit and first quarter 2015 review, both Jacoby and Law made false and misleading representations and material omissions regarding transactions with Distributor A, including falsely and misleadingly representing that:

(1)     "They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP";

(2)     "There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and"

(3)     "They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements."

(s)     "In the March 20, 2015 letter, Jacoby and Law also falsely represented that Osiris entered into an arrangement with Distributor A for the sale of Ovation during December 2014, which was false and misleading because persuasive evidence of the arrangement did not exist until January 2015.  In that letter, they also falsely represented that they had fulfilled their responsibilities for the design, implementation, and

23

maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error."

(t)      "In their interactions with the Auditor, Jacoby and Law also omitted the material information that Distributor A would not pay for product sold unless and until it sold the product to end-users."

(u)      "Additionally, during its third quarter 2015 review of Osiris' financial statements, the Auditor requested from Osiris, primarily through Jacoby and Law, detailed information regarding Osiris' revenue recognition practices.  In connection with the Auditor's request, Jacoby and Law, with assistance from others in Osiris' finance department, prepared accounting memoranda that purported to describe how Osiris recognized revenue with respect to its distributors.  In connection with these accounting memoranda, Jacoby and Law made material false and misleading statements and omissions to the Auditor and to Osiris' outside accounting consultant."

(v)      "Among other things, both Jacoby and Law participated in the drafting and editing of an accounting memorandum titled '[Distributor A] – Discussion of Revenue Related to Year End Ovation Sales,' which was 'from' Jacoby and another Osiris accountant.  This memorandum was an accounting record that was materially false and misleading because it stated that by December 31, 2014, Distributor A agreed to purchase over $1 million in Ovation.  Further, after both the Auditor and consultant commented that it was inappropriate to recognize revenue if Osiris was to be paid from the cash flow generated by Distributor A's sale of product, Jacoby and Law directly or indirectly edited the memo to omit this fact."

(w)     "Among other things, both Jacoby and Law also participated in the drafting and editing of an accounting memorandum titled '[Distributor A] – Q1 2015 Sale.'  This memorandum was an accounting record that was materially false and misleading because it omitted the material fact that Osiris was to be paid from the cash flow generated by Distributor A's sale of product."

(x)     "Additionally, on or about November 5, 2015, Jacoby created, signed, and sent to Distributor A's CEO a false record in the form of a letter backdated to nearly a year earlier – December 29, 2014 – that claimed to 'memorialize' the terms of Osiris' sale to Distributor A of approximately $1.1 million in consignment inventory of product.  Jacoby emailed the letter to Distributor A from his personal, non-Osiris email account, stating:"

> . . . attached is something that I think you should find and send to me in an email saying you had this in your file from late last year, and just came across it – and that it does memorialize our several phone conversations . . . .  Call me if necessary, but write a wonderfully warm and convincing email, please – send it to my Osiris email.

(y)     "Shortly thereafter, Jacoby caught a typo in the letter and sent a corrected version, again from his personal, non-Osiris email account, with the subject line 'Understanding.'"

(z)     "As requested by Jacoby, Distributor A's CEO then sent the backdated letter to Jacoby's Osiris email account.  Jacoby replied, stating in part, 'glad you found this and glad you don't have the email retention policy that we do . . . .'  The backdated letter and email chain were then forwarded to the Auditor."

### Jacoby's, Law's, Debrabandere's, and Montgomery's Unlawful Conduct Related to Distributor B

41.     According to the SEC Complaint, "Distributor B is a Turkish company that was

25

negotiating a potential distributor agreement with Osiris in early 2015.  Based on the conduct of

Jacoby, Law, and Debrabandere, in the first quarter of 2015 Osiris improperly recognized at least

$650,000 in revenue associated with a purported product sale to Distributor B.  Further, Jacoby,

Law, Debrabandere, and Montgomery engaged in other deceptive conduct regarding Distributor

B, including making material false and misleading statements and material omissions to the

Auditor."

42.    "In early 2015, Osiris' sales department began negotiating a potential distributor

agreement with Distributor B.  Osiris' efforts to finalize the terms of the deal became intense by

the end of the first quarter 2015 because the revenue from the transaction with Distributor B was

intended to meet Debrabandere's revenue target for that quarter."

43.    "On or about March 27, 2015, Montgomery notified Debrabandere that Distributor

B was 'uncomfortable paying for' Grafix, but was willing to pay for Cartiform; however, Osiris

did not have available enough Cartiform to fill a potential order by Distributor B.  Debrabandere

responded '[w]e have flexibility. We can include [G]rafix and later swap to [C]artiform when we

have it[.]'  Debrabandere also understood that Distributor B did not plan to pay in full for its order

and stated that it 'would be great' if Distributor B was willing to make a partial payment."

44.    "On March 31, 2015 – the last day of the first quarter – Jacoby executed a

distribution agreement and closing checklist with Distributor B on behalf of Osiris.  That same

day, Jacoby provided a copy of the executed agreements to Law in an email stating that Osiris

would be receiving a wire for $100,000."

45.    "The Effective Date of the distribution agreement was April 1, 2015.  Pursuant to

the terms of the distribution agreement, Distributor B agreed to pay Osiris $100,000 by March 31,

2015 for an 'initial stocking order of Cartiform 10mm' and agreed to acquire an additional

$650,000 of Cartiform or Grafix by December 31, 2015; however, Osiris' agreement to ship the products to Distributor B was subject to Distributor B's ability to obtain required licenses, certificates, and permits.  Further, at this time, Distributor B was not seeking regulatory approval to import Grafix into Turkey."

46.     "On March 31, 2015, at Jacoby's direction, Osiris transferred 80 units of Cartiform and 844 units of Grafix from its production facility to a third-party storage facility in Baltimore, Maryland.  Osiris paid the fees associated with the transfer and storage of the product.  There was no set timeframe for delivery of the product."

47.     "By the end of the first quarter 2015, Distributor B had paid Osiris only $100,000, had not received regulatory approval for the shipment of Osiris products into Turkey, had not physically received any Osiris product, and, upon information and belief, had not provided Osiris with a purchase order."

48.     "Nonetheless, Osiris recognized $750,000 of revenue associated with sales of product to Distributor B for the first quarter of 2015."

49.     "It was improper for Osiris to recognize at least $650,000 in revenue during the first quarter of 2015 because persuasive evidence of an arrangement did not exist, delivery had not been accomplished, and the revenue was not realized, realizable, or earned."

### Additional Deceptive Conduct Regarding Distributor B

50.     According to the SEC Complaint, "Debrabandere directed that Osiris include Grafix in the purported sale to Distributor B, despite the fact that Distributor B did not want to purchase that product at the time."

51.     "On or about May 11, 2015, Jacoby, Law, and Debrabandere, signed the management representation letter to the Auditor in connection with the Auditor's first quarter 2015

review of Osiris' financial statements.  Through this letter, as well as their other interactions with the Auditors during the first quarter 2015 review, Jacoby, Law, and Debrabandere made false and misleading representations and material omissions regarding transactions with Distributor B, including falsely and misleadingly representing that:"

       (a)     "They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;"

       (b)     "There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and"

       (c)     "They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements."

52.     "Additionally, to further the scheme to artificially inflate Osiris' revenue, Jacoby, Law, and Montgomery caused Osiris to book additional revenue from Distributor B for the third quarter of 2015.  They did so even though Distributor B still had not received regulatory approval to import the product into Turkey, had not paid the $650,000 contemplated by the April 1, 2015 contract, and had not requested additional product during the third quarter.  In fact, in connection with $1.7 million of the revenue, they booked revenue to the third quarter several weeks after the third quarter had ended."

53.     "First, on September 30, 2015 – the last day of the third quarter – Jacoby and La received email correspondence from Montgomery that proposed a 'Turkey order' of $250,000. Montgomery explained that Osiris might 'need' the proposed order if another distributor ordered less than $1 million in product.  Later in the day, Law emailed Osiris employees that 'Turkey is coming, no [other distributor].'"

28

54.    "As a result of Jacoby's and Law's conduct, Osiris improperly booked $250,000 in revenue associated with Distributor B."

55.    "Then, in October 2015, Jacoby, Law, and Montgomery caused Osiris to improperly book another $1.7 million in revenue that was purportedly associated with Distributor B."

56.    "By mid-October, Jacoby, Law, and Montgomery were aware that revenue would have to be decreased due to the errors in accounting for revenue associated with Distributor C . . . ."  For example, on or about October 6, 2015, Montgomery notified another Osiris employee that he had learned that Osiris had not been booking the actual revenue received from Distributor C each quarter.  On or about October 9, 2015, Jacoby asked Law to provide him with 'the exact [Distributor C] number for each of the three quarters of this year – both our gross and then the actual.'  Law responded by providing a spreadsheet that included an analysis of 'Revenue per [Distributor C],' '[Osiris] Revenue Recognized,' and a 'Difference' totaling over $1.7 million."

57.    "On or about October 18, 2015 – eighteen days into the fourth quarter – Montgomery sent Jacoby a spreadsheet reflecting 'the order we discussed …,' which was for $1.7 million in product."

58.    "On or about October 19, 2015, Jacoby emailed Law '[w]e need to talk about Turkey tomorrow – there is a $1.7M order that could/should be Q3[.]'"

59.    "The next day, Montgomery sent Jacoby an email that attached an unsigned letter dated September 30, 2015, which was named 'Montgomery Q3 Order.docx.'  The letter falsely stated that Distributor B 'would like to purchase' $1.7 million in Osiris products.  Later in the day, Jacoby emailed Law a copy of this false letter, which was signed by Montgomery."

60.    "After receiving the letter, Law instructed the assistant controller to work with

29

another employee to book the $1.7 million.  Law also provided the letter to Osiris' customer service department, which requested a copy 'to serve as the purchase request[.]'"

61.     "Law also asked Montgomery for correspondence to support the $1.7 million 'sale.' In response, Montgomery claimed that the order was verbal."

62.     "The backdated letter to Jacoby and signed by Montgomery was provided to Osiris' Auditor."

63.     "Both the $250,000 and $1.7 million were reversed in November 2015, after Osiris' Auditor determined that it would not be appropriate for Osiris to recognize the revenue.  The revenue was not reflected in Osiris' financial statements filed with the SEC, but was reflected on Osiris' books and records before it was reversed."

**Jacoby's, Law's, and Debrabandere's Fraudulent
Conduct and Financial Misstatements Related to Distributor C**

64.     According to the SEC Complaint, "[d]uring the first two quarters of 2015, as a result of the conduct of Jacoby and Law, Osiris improperly recognized revenue related to Distributor C by using the list price for BIO4 instead of the actual sales price of the product to calculate revenue, resulting in a material overstatement of revenue.  Additionally, during the first three quarters of 2015, as a result of the conduct of Jacoby, Law, and Debrabandere, Osiris improperly recognized revenue on consigned product, resulting in a material overstatement of revenue.  Further, due to the conduct of Jacoby and Law, Osiris made additional false and misleading representations and material omissions regarding transactions with Distributor C."

65.     "In December 2014, Osiris entered into an exclusive service agreement for BIO4 with Distributor C.  Debrabandere signed the agreement, and Law and Jacoby were involved in assessing the accounting implications of the agreement and were aware, or should have been aware, of the agreement's terms."

66.     "Pursuant to the agreement, Distributor C served as the exclusive marketer and promoter of BIO4.  When a customer purchased the product, Distributor C would obtain an order from the customer and would provide certain details of the order to Osiris.  The customer would pay Distributor C.  Distributor C was entitled to a commission payment and administrative fee, which were to be netted out of the payments Distributor C then made to Osiris."

### The Fraudulent and Improper Recognition of Artificial Revenue in the First, Second, and Third Quarters of 2015 Due to Using the Wrong Price

67.     According to the SEC Complaint, "Osiris' 2014 Form 10-K and its Forms 10-Q for the first and second quarters of 2015 represented that, in connection with its agreement with Distributor C, Osiris would recognize as revenue the amounts charged to customers for the product.  Osiris' Form 10-Q for the third quarter of 2015 stated that, "[t]he amount we recognize as revenue is based on our list price for [the product].  We reconcile and record the difference, if any, between the revenue previously recognized and the selling price when we receive the data from [Distributor C] on a monthly basis."

68.     "Distributor C and Osiris had a "list price" for the product; however, Distributor C was permitted to sell the product at a discount to the list price as long as it paid Osiris a contractually-determined minimum average fee for the product."

69.     "Distributor C did not provide Osiris with the specific price that it charged each customer.  Instead, Distributor C provided Osiris with reconciliation reports that provided Osiris with the actual revenue related to sales and data through which Osiris could calculate the average sales price ('ASP')."

70.     "Distributor C's first sales under the agreement occurred in February 2015 and Osiris recognized revenue stemming from those sales using the 'list price.'"

71.     "On or about March 13, 2015, Distributor C provided Osiris with a report that stated

the actual revenue related to sales for February 2015.  Osiris' assistant controller forwarded the report to Jacoby and explained that the Distributor C report did not match the list price in Osiris' system, meaning that the revenue amount would not reconcile."

72.    "On or about April 2, 2015, the assistant controller again expressed concern with using the list price to recognize revenue.  When Jacoby was notified about the concerns, he expressed frustration with the assistant controller, stating in part, 'I've tried repeatedly to explain materiality to [the assistant controller] without success.'  Jacoby then followed up with an email to Osiris employees, stating that list prices would be used 'for all internal reporting.'  Shortly thereafter, the assistant controller sent Jacoby, Law, and others a report that used list price to calculate 'total sales' for the first quarter.'"

73.    "On or about April 7, 2015 – a month before Osiris filed its Form 10-Q for the first quarter of 2015 – Distributor C provided Osiris' finance department with a document that stated the actual revenue related to sales for February and March 2015, and which provided data that would permit Osiris to calculate the ASP.  That same day, the report was provided to Jacoby and Law."

74.    "For the second quarter of 2015, Osiris' finance department received reconciliation reports on or about May 7, 2015, June 5, 2015, and July 13, 2015.  The July 13, 2015 report was provided to Jacoby and Law prior to Osiris' filing of its Form 10-Q for the second quarter of 2015. The July 13, 2015 report provided, among other information, the actual revenue related to sales for June 2015 and ASP information through June 2015."

75.    "The information provided in these reports demonstrated that by relying on the list price to recognize revenue, Osiris was overstating its revenue.  Nonetheless, Osiris did not adjust the revenue it had previously recorded for these transactions to the actual amounts earned.  Instead,

it continued to recognize revenue for the Distributor C transactions at the inflated list price, resulting in Osiris overstating revenue in the first and second quarters of 2015."

76.     "For the third quarter of 2015, Osiris' finance department received reconciliation reports on or about August 11, 2015, September 9, 2015, and October 7, 2015.  Prior to Osiris' filing of its Form 10-Q for the third quarter of 2015, the August 11, 2015 and the October 7, 2015 reports were provided to Jacoby and Law and the September 2015 report was provided to Law. The October 2015 report provided, among other information, the actual revenue related to sales for September 2015 and ASP information through September 2015."

77.     "The information provided in these reports demonstrated that by relying on the list price to recognize revenue, Osiris was overstating its revenue.  Nonetheless, Osiris did not properly and adequately adjust the revenue it had previously recorded for these transactions to the actual amounts earned, resulting in Osiris overstating revenue in the third quarter of 2015."

78.     "Osiris' recognition of this revenue during the first, second, and third quarters of 2015 did not comply with GAAP because the revenue was not realized, realizable, or earned."

79.     "The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris' actual revenue and would consider it important that Osiris' officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue."

80.     "In light of all of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their background, education, and job responsibilities, Jacoby and Law knew, were reckless in not knowing, and were negligent in not knowing that recording the Distributor C revenue described above at list price was improper and did not comply with GAAP."

**The Fraudulent and Improper Recognition of Revenue
on Consigned Product in the First, Second, and Third Quarters of 2015**

81.     According to the SEC Complaint, "[i]n Osiris' Forms 10-Q for the first, second, and third quarters of 2015, Osiris disclosed that no revenue was recognized upon the placement of inventory into consignment; instead, Osiris stated that for consigned product, revenue was recognized when Osiris received appropriate notification that the product had been used in a surgical procedure."

82.     "Pursuant to its agreement with Distributor C, Osiris would sometimes supply the product to end-user customers on consignment.  For consignment inventory, title remained with Osiris until the end-user customer used the inventory, at which point title and risk of loss transferred to the customer."

83.     "Despite the fact that some product shipments constituted consignment, by March 2015, Debrabandere directed that Osiris account for all shipments of the product as 'sales' so that revenue could be recognized.  In an email to Osiris employees, including Jacoby, Law, and Montgomery, he explained, '[w]e cannot wait until we receive PO's to book these as a sale …. Goal is to get to $1 million bio4 this quarter.'"

84.     "Osiris employees, including the assistant controller, expressed concern about booking all shipments as sales, even if the shipments were for consignment.  For example, the assistant controller told Jacoby that she believed 'we should record the shipment as consignment and then do the accrual per the implant information if and when we receive it from Distributor C.'"

85.     "Jacoby and Law were both involved in follow-up communications with Osiris employees regarding Debrabandere's direction to book consignment as sales.  Further, in March 2015, Law noted to Osiris employees, including Jacoby, that it was critical for Osiris to obtain the sales price from Distributor C; otherwise, Osiris would not be permitted to recognize 'gross' (*i.e.*, 'top line' revenue)."

86.     "Nonetheless, Jacoby followed Debrabandere's instructions and directed that all shipments, including those that included consigned inventory, would be booked as a sale for which revenue would be recognized.  As a result, Osiris improperly overstated revenue by recognizing revenue on consigned inventory."

87.     "It was improper for Osiris to recognize revenue on consigned product during the first, second, and third quarters of 2015 because the revenue was not realized, realizable, or earned."

88.     "It was also improper for Osiris to recognize revenue on consigned product during the first, second, and third quarters of 2015 because it was in violation of Osiris' disclosed policy, which stated that Osiris did not recognize revenue on consigned product."

89.     "The improper recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris' actual revenue and would consider it important that Osiris' officers were engaged in fraudulent conduct, including misstatements of revenue and a scheme to improperly inflate revenue."

### Jacoby's and Law's Additional Misstatements Regarding Distributor C

90.     According to the SEC Complaint, "[i]n its Form 10-Q for the third quarter of 2015 that was signed by Jacoby and Law and also certified by Law, Osiris falsely and misleadingly stated '[d]uring the third quarter of 2015, the Company received true-up information from another distributor which showed the average price for product sales during the year.'"

91.     "Similarly, in its Form 8-K filed that was filed on November 20, 2015 and signed by Law, Osiris falsely and misleadingly stated '[d]uring the third quarter of 2015, the Company received final pricing information from another distributor which showed the average price for product sale during the year.'"

92.     "These statements were false and misleading because, in reality, Osiris' finance department, including Jacoby and Law, received pricing information from Distributor C before the third quarter.  In fact, Osiris had received form Distributor C pricing information that included the ASP for the first and second quarters of 2015, prior to the filing of Osiris' Forms 10-Q for those quarters.  The third quarter Form 10-Q and November 20, 2015 Form 8-K also failed to disclose the material information that Osiris was recognizing revenue on consigned product and that Osiris' accounting errors related to Distributor C also included adjustments necessary due to the recognition of revenue on consigned product."

### Additional Deceptive Conduct Regarding Distributor C

93.     According to the SEC Complaint, "[o]n or about May 11, 2015, August 10, 2015, and November 16, 2015, Jacoby, Law, and Debrabandere signed or otherwise acknowledged management representation letters to the Auditor in connection with the Auditor's first, second, and third quarter 2015 reviews of Osiris' financial statements.  Through these letters, as well as their other interactions with the Auditors during the first, second, and third quarter 2015 reviews, Jacoby, Law, and Debrabandere made false and misleading representations and material omissions regarding transactions with Distributor C, including falsely and misleadingly representing that:"

(a)     "They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;"

(b)     "There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and"

(c)     "They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, of which could have a material effect on the financial statements."

94.     "Jacoby, Law, and Debrabandere also omitted material information in communications with Osiris' Auditor, including that Osiris was recognizing revenue on product consigned to Distributor C's customers.  Jacoby and Law further omitted the material information that Osiris had received pricing information from Distributor C prior to the filing of its Forms 10-Q for the first and second quarter of 2015."

95.     "Additionally, during its third quarter 2015 review of Osiris' financial statements, the Auditor requested from Osiris, primarily through Jacoby and Law, detailed information regarding Osiris' revenue recognition practices.  In connection with the Auditor's request, Jacoby and Law, with assistance from others in Osiris' finance department, prepared accounting memoranda that purported to describe how Osiris recognized revenue with respect to its distributors.  In connection with these accounting memoranda, Jacoby and Law made material false and misleading statements and omissions to the Auditor and to Osiris' outside accounting consultant."

96.     "Among other things, the accounting memorandum titled '[Distributor C] Revenue Recognition Memo,' which was reviewed by Jacoby and Law, was materially false and misleading because it stated that prior to September 2015, Distributor C did not share the ASP with Osiris and that Osiris booked revenue at list price because it did not have the ASP information."

### Jacoby's, Law's, and Debrabandere's Fraudulent Conduct and Improper Accounting Related to Distributor D

97.     According to the SEC Complaint, "[d]uring 2014 and the first three quarters of 2015, based on the conduct of Debrabandere, Jacoby, and Law, Osiris improperly prematurely recognized revenue related to its sales to Distributor D. Jacoby and Law also made material false and misleading statements and material omissions to Osiris' auditor regarding Distributor D."

### The Fraudulent and Improper Recognition of Revenue Throughout
### 2014 and the First Three Quarters of 2015

98.     According to the SEC Complaint, "[i]n 2014 and 2015, Distributor E, an entity associated with Distributor D, was one of Osiris' distributors. Distributor E acted as a commissioned sales agent for Osiris by, among other things, selling Ovation and Grafix to Distributor D."

99.     "Through Distributor E, Osiris sold product to Distributor D during 2014 and the first three quarters of 2015.  Osiris' sales to Distributor D were purportedly made with 30-day payment terms; however, upon information and belief, Osiris allowed Distributor D to withhold payment until product was resold to an end-user – often much later than 30 days.  Despite this contingency, Osiris repeatedly prematurely recognized revenue on product sold to Distributor D."

100.    "Throughout 2014 and the first three quarters of 2015, Distributor D withheld payments beyond 30 days.  Debrabandere did not object to this practice and, upon information and belief, Debrabandere agreed and/or was aware that Distributor D would not make payments to Osiris until product was sold to an end-user."

101.    "By 2015, Jacoby and Law knew, were reckless in not knowing, and should have known that Distributor D's payments were contingent, and/or that Osiris' allowance for Distributor D's doubtful accounts was insufficient.  Nonetheless, they failed to make any change in Osiris' accounting related to Distributor D.  In January 2015, Jacoby emailed the assistant controller and copied Law, attaching a copy of Distributor D's statement, which showed a balance due of over $7 million and over $2 million 120 days past due.  The subject line of the email read 'Come Explain to me why [Debrabandere] shouldn't fire you, me and [Law] over the attached.'"

102.    "During 2015, Osiris' Auditor was concerned about the extensive outstanding amounts due to Osiris from Distributor D.  Law informed the Auditor that Osiris had lost a

collections employee and falsely stated that the loss of the employee was causing the delay in collecting from Distributor D.  In July 2015, Jacoby reached out to Distributor E's CEO to notify him that Osiris had not received any payments from Distributor D since April 2015."

103.    "In September 2015, the CEO of Distributor E notified Jacoby and Law that Distributor E was taking over all remaining accounts payable to Osiris by Distributor D for Ovation and sent an 'intended' 10-month payment plan for nearly $6 million.  With respect to Grafix, the CEO of Distributor E explained that he needed to speak with Debrabandere and noted that a doctor had been injured and had not been available for a few months.  When Law asked what the doctor's injury had to do with Osiris receiving payments for the product, the CEO of Distributor E responded, '[w]e have a territory of hospital (1 doctor as the key) and have helped out Osiris immensely with purchasing inventory above and beyond our needs so if you don't want us to return the Grafix then you need to understand where we can sell it.  [Debrabandere] and I are speaking tomorrow.'  Jacoby forwarded this email to Debrabandere who responded '[y]up indeed.'"

104.    "In connection with transactions with Distributor D, Osiris prematurely recognized over $14 million in revenue during 2014 and over $4 million in revenue during the first three quarters of 2015.  Osiris' recognition of this revenue during the quarters in which it was recognized was improper and did not comply with GAAP because Distributor D routinely paid Osiris belatedly and its payments to Osiris remained contingent upon the sale of product to end-users; therefore, the price was not fixed or determinable and revenue was not realized, realizable, or earned."

105.    "The improper premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of Osiris' actual revenue each quarter and would consider it important that Osiris' officers were engaged in fraudulent conduct,

including misstatements of revenue and a scheme to improperly inflate revenue."

**Osiris' Restatement of the 2014 Revenue Associated with Distributor D**

106.    In 2016, Osiris filed a Form 10-K/A for the year ended 2014.   Through this amended Form 10-K, Osiris restated approximately $7.6 million in revenue associated with Distributor D.

**Other Deceptive Conduct Regarding Distributor D**

107.    According to the SEC Complaint, "[o]n or about May 12, 2014, August 11, 2014, November 10, 2014, March 20, 2015, May 11, 2015, August 10, 2015, and November 16, 2015, Debrabandere signed or otherwise acknowledged letters to the Auditor in connection with the Auditor's 2014 audit and first, second, and third quarters of 2014 and 2015 reviews of Osiris' financial statements.   Through these letters, as well as other interactions with the Auditors, Debrabandere made false and misleading representations and material omissions regarding transactions with Distributor D, including falsely and misleadingly representing that:"

(a)    "He had fulfilled his responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;"

(b)    "There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and"

(c)    "He had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements."

108.    "Additionally, in the March 20, 2015 letter, which was in connection with the Auditor's 2014 audit of Osiris' financial statements, Debrabandere falsely represented that he had fulfilled his responsibilities for the design, implementation, and maintenance of internal controls

relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error."

109.    "Additionally, in the May 11, 2015, August 10, 2015, and November 16, 2015 letters, which were in connection with the Auditor's first, second, and third quarter 2015 reviews of Osiris' financial statements, Debrabandere falsely represented that there were no material transactions, side agreements, or other arrangements (either written or oral) that had not been disclosed to the Auditor and properly recorded in the accounting records underlying the financial statements."

110.    "On or about May 11, 2015, August 10, 2015, and November 16, 2015, Jacoby and Law signed or otherwise acknowledged letters to the Auditor in connection with the Auditor's first, second, and third quarters of 2015 reviews of Osiris' financial statements.  Through these letters, as well as other interactions with the Auditors, Jacoby and Law made false and misleading representations and material omissions regarding transactions with Distributor D, including falsely and misleadingly representing that:"

(a)    "They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;"

(b)    "There were no material transactions, side agreements, or other arrangements (either written or oral) that have not been disclosed to the Auditor and properly recorded in the accounting records underlying the financial statements; and"

(c)    "They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements."

111.    "In 2015, Law also misrepresented to the Auditor that Osiris' collections issues

with Distributor D were the result of the loss of a collections employee.   Jacoby also misrepresented to the Auditor that Distributor D was an end-user of Osiris' products."

112.   "Additionally, Debrabandere, Jacoby, and Law did not notify the Auditor that Distributor E took over the payment obligations of Distributor D in September 2015, nor did they disclose Distributor E's intended payment plan to the Auditor.  In fact, in October 2015 – the month after the payment plan was established – Jacoby responded to an Auditor inquiry regarding the relationship between Distributor D and Distributor E by stating that Osiris was unaware of a "formal relationship" between the entities."

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE RELEVANT PERIOD

113.   On May l2, 2014, the Company issued a press release entitled *Osiris Reports First Quarter 2014 Results: Revenue Up 25% and Gross Margin improved from 73% to 78%*.  This press release represented the following "Highlights and Recent Developments":

- Increased product revenue for the quarter to $10.1 million -- a 146% increase over the first quarter 2013 and 25% from previous quarter.

- Improved gross margin from 73% in previous quarter to 78% in the first quarter of 2014 gross profit increased 169% over the first quarter of 2013 and 32% over the previous quarter.

- Obtained Medicare coverage in 9 states representing 18% of Medicare-insured lives.

- Expanded commercially, adding 70 experienced wound care professionals to the organization

- Presented Grafix® pharmacoeconomic and scientific studies at Symposium for Advanced Wound Care demonstrating statistically significant economic benefits of wound closure and showing a quantitative comparison of wound relevant pharmacological parameters between cryopreserved and non-cryopreserved human amnion membranes.

- Featured at the 2014 American Academy of Orthopaedic Surgeons

Annual Meeting, a Cartiform® study confirming preservation of three-dimensional biologic architecture found in native articular cartilage.

- Strengthened management team - promoting Frank D. Czworka, Jr., to Vice President and General Manager of Wound Care, appointing Therésa K. Dixon, to General Manager, Market Access and Reimbursement, and Dwayne Montgomery to General manager, Orthopedics and Sports Medicine.

- Engaged Svrithcs Chairman Emeritus Hansjorg Wyss to serve as a strategic advisor to the company

- Received $15 million cash payment from Mesoblast related to Prochymal the third milestone of the Purchase Agreement worth up to $100 million plus royalties.

- Reported loss from continuing operations of $0.6 million for first quarter 2014, ending the quarter with $91.3 million of total assets.

114. The press release also stated: "Research and development expenses for the first quarter of 2014 were $0.7 million, decreased from the $1.0 million incurred in the first quarter of 2013. As a result of our increased commercial activity, our selling, general and administrative expenses were $7.2 million for the first quarter of 2014, compared to $2.4 million for the same period of the prior year."

115. Debrabandere also stated: "Our focus on execution has driven this strong start to 2014. Now, along with the addition of key leadership, we are poised to carry this momentum forward as we continue to grow every facet of our business."

116. On May 12, 2014, the Company filed a Form 10-Q with the SEC for the first quarter of 2014 that restated the financial results expressed in the May 12, 2014 press release and assured investors that "[t]here [had] not been any changes in [the Company's] internal control over financial reporting that occurred during the quarter ended March 31, 2014 that [had] materially affected, or [was] reasonably likely to materially affect, [the Company's] internal control over financial reporting."

117.    The Company's May 12, 2014 Form 10-Q also disclosed: "During the first fiscal quarters of fiscal 2014 and 2013, revenues from one of the distributors of our Biosurgery products, Stability Biologics, comprised approximately 58% and 64%, respectively, of our total Biosurgery product revenues."

118.    On August 7, 2014, the Company issued a press release entitled *Osiris Therapeutics Announces Second Quarter 2014 Financial Results: Revenue Up 32% Over Previous Quarter*. This press release issued the following "Highlights and Recent Developments":

- Increased product revenue for the quarter to $13.3 million - a 151% increase over Q2 2013 and a 32% increase over previous quarter.

- Held gross margin steady at 78% - gross profit increased 172% over Q2 2013 and 32% over previous quarter.

- Completed the quarter with a loss from continuing operations (excl. non-cash items) of $66,000.

- Obtained Medicare coverage in 10 states, representing 27% of Medicare-insured lives. Published manuscript in the International Wound Journal from Osiris' multi-center (n=20), randomized, controlled clinical trial, Protocol 302, which demonstrated overwhelming efficacy of Grafix® compared to control in the closure of diabetic foot ulcers over 12 weeks (62% vs. 21.3%, p=0.0001, n=97).

- Agreed on path forward with FDA to complete a Biologics License Application for Grafix in order to obtain additional claims and indications.

- Added several new sizes to the Grafix product lines, giving health care providers the ability to optimally match Grafix to the wound size, reduce overall treatment costs, and eliminate concerns regarding product waste. Grafix. is well-positioned to remain a cost effective option within the Centers for Medicare & Medicaid Services bundled payment system.

119.    The press release also stated: "Research and development expenses for the second quarter of 20l4 were 1.1 million, an increase from $0.7 million in the first quarter of this year.  As a result of our increased commercial activity, our selling, general and administrative expenses were

$9.3 million for the second quarter of 2014, compared to $54.2 million for the same period of the prior year."

120.    Debrabandere stated in the press release: "It is very encouraging that the quarter-over-quarter revenue growth of 32% was largely driven by our new wound care sales team . . . Revenue growth and bottom line improvement were impressive while we continue to invest and differentiate our products scientifically, clinically and through regulatory strategies."

121.    On August 11, 2014, the Company filed a Form 10-Q with the SEC for the second quarter of 2014 that discussed the financial results expressed in the August 7, 2014 press release and assured investors that "[t]here [had] not been any changes in [the Company's] internal control over financial reporting that occurred during the quarter ended June 30, 2014 that [had] materially affected, or [was] reasonably likely to materially affect [the Company's] internal control over financial reporting."

122.    On November 7, 2014, the Company issued a press release entitled *Osiris Therapeutics Announces Third Quarter 2014 Financial Results: Revenue up 29% and Company Turned Profitable*.  This press release issued the following "highlights and Recent Developments":

- Increased product revenue for the quarter to $17.2 million - a 29% increase over previous quarter and 150% increase over the same period last year. Held gross margin steady at 78% for the first three quarters of fiscal 2014.

- Completed the quarter with income from continued operations of $710,000 or $0.02 per share.

- Increased Medicare coverage from 10 to 29 states, representing an increase from 27% to 72% of Medicare-insured lives compared to previous quarter.

- Entered into an exclusive distribution partnership for our cartilage regenerating product Cartiform® with Arthrex Inc., the leader in sports medicine.

- Obtained final letter from FDA confirming the resolution of the issues of the Untitled Letter of September 2013 and submitted the confirmatory

Phase III clinical trial protocol for chronic wounds to medical reviewer. Osiris is seeking BLA approval for our amnion/chorion products for additional claims and indications.

• Prochymal® submitted to Japanese Health Authorities by our partner Mesoblast, seeking approval for pediatric and adult Graft-versus-Host Disease.

123. The press release also noted: "Research and development expenses for the third quarter of 2014 were $1.2 million, an increase from the $0.9 million incurred in the same period of the prior year.  As a result of our increased commercial activity, our selling, general and administrative expenses were $10.9 million for the third quarter of 2014, compared to $4.0 million for the same period of the prior year."

124. Debrabandere also stated in the press release: "This quarter represents a turning point for Osiris . . . .  Our wound care business continues to drive revenue growth supported by the expansion of the sales force, the significant increase in the number of approvals for Medicare reimbursement and the positive scientific, clinical and pharmaco-economic data of Grafix®."

125. On November 10, 2014, the Company filed a Form 10-Q with the SEC for the third quarter of 2014 that discussed the financial results expressed in the November 7, 2014 press release and assured investors that "[t]here [had] not been any changes in the [Company's] internal control over financial reporting that occurred during the quarter ended September 30, 2014 that [had] a materially affected, or [was] reasonably likely to materially affect [the Company's] internal control over financial reporting."

126. On March 5, 2015, the Company issued a press release entitled *Osiris Therapeutics Fourth Quarter and Full Year 2014 Financial Results: For the Full Year, Revenue Increased 146% and Company Reports Record Revenue in Fourth Quarter.*  This press release discussed the "Full Year and Fourth Quarter Highlights":

- Reported product revenue of $59.9 million in 2014, up 146% from the prior year.

- Increased gross profit from operations from $17.7 to $46.7 million, up 164% from the prior year. Gross margin improved from 73% to 78%.

  Signed strategic commercial partnerships for the Orthopaedics unit, BIO4 TM with Stryker Corporation, and for the Sports Medicine unit, Cartiform® with Arthrex, Inc.

- Improved Medicare reimbursement for Grafix® to over 70% of Medicare insured lives, compared to no reimbursement in 2013.

- Strengthened the leadership team and made significant progress in transforming Osiris to a competitive commercial enterprise through the addition of 106 sales professionals and the creation of marketing, customer service, health policy and reimbursement departments.

- Product revenue for the quarter rose to $19.3 million, a 138% increase compared to fourth quarter 2013.

- Completed the quarter with income from continuing operations of $1.1 million, or $0.03 per share, after recognizing income taxes of $89,000.

- Obtained final letter from FDA confirming the resolution of the issues of the Untitled Letter of September 2013.  Osiris submitted an IND for our viable placental membrane for the treatment of chronic wounds and will conduct a confirmatory Phase 3 trial to seek BLA approval.

- Prochymal® submitted to Japanese Health Authorities by our partner Mesoblast, seeking approval for pediatric and adult Graft-versus-Host Disease.

127.    The press release also stated: "Research and development expenses for the fourth quarter of 2014 were $3.9 million, an increase from the $1.9 million incurred in the same period of the prior year.  As a result of our increased commercial activity, our selling, general and administrative expenses were $10.0 million for the fourth quarter of 2014, compared to $4.1 million for the same period of the prior year."

128.    Debrabandere also stated in the press release: "We continue to grow revenue, add commercial talent and expand our pipeline in our Orthopaedics, Sports Medicine and Wound Care

47

units […].  Our investments in wound care resulted in rapid revenue growth in both commercial and federal payor segments with wound care sales quadrupling compared to 2013.  We are also looking forward to the launch of both BIO4 and Cartiform in collaboration with Stryker and Arthrex, respectively."

129.    On March 20, 2015, the Company filed a Form 10-K with the SEC for the fiscal year ended December 30, 2014 that discussed the financial results expressed in the March 5, 2015 press release.  The Form 10-K stated in relevant part:

> ***Previously Reported Material Weakness***.    During the year ended December 31, 2014, we developed and implemented new control procedures to address a previously identified material weakness in our internal control over financial reporting.  As of December 31, 2013, our management determined that our processes, procedures and controls related to financial reporting were not effective to ensure effective oversight of the work performed by, and the accuracy of financial information or professional conclusions provided by, third-party tax advisors, regarding components of the income tax provision calculation (specifically the allocation between continuing and discontinuing operations), given a one-time significant transaction of disposing of a business segment.  We have taken steps to remediate the material weakness, including adherence to existing control procedures and implementation of enhanced controls related to review and oversight of complex transactions and infrequent events. Additionally, we engaged a new third party tax advisor to oversee and prepare the Company's tax provision and other related documents.  We believe that these remediation efforts have improved our internal control over tax accounting, as well as our disclosure controls and procedures, and that the material weakness has been remediated at December 31, 2014.

130.    The press releases and financial documents described above contained statements that were materially false and misleading, and/or failed to disclose the following relevant facts: (a) the Company's internal controls over financial reporting were ineffective and inadequate beginning at least as early as December 2014 and remained so despite Defendants' knowledge of the deficiencies (b) as a result of the deficiencies in its internal controls, the revenues that the Company reported from contracts with its distributors were materially inflated; and (3) the statements issued by Defendants regarding the Company's present performance and future outlook

were materially false and misleading, and/or lacked a reasonable basis.

131.    On May 8, 2015, the Company issued a press release entitled *Osiris Therapeutics Announces First Quarter 2015 Financial Results*.   This press release discussed the following "Highlights and Recent Developments":

- Increased product revenue for the quarter to $21.0 million - a 109% increase over Q1 2014.

- Held gross margin remained consistent at 78%.

- Completed the quarter with after-tax income from operations of $1.4 million or $0.04 per share.

- Launched BIO4 ™ in collaboration with Stryker at the American Academy of Orthopaedic Surgeons.

- Increased coverage to 40 million Medicare lives, 21 million Medicaid lives and initiated commercial coverage for 37 million lives for Grafix®.

- Ended the quarter with $101.6 million of total assets.

132.    The press release also stated: "Research and development expenses for the first quarter of 2015 were $1.6 million, increased from the $0.7 million incurred in the first quarter of 2014.  As a result of our increased commercial activity, our selling, general and administrative expenses were $12.8 million for the first quarter of 2015, compared to $7.2 million for the same period of the prior year."

133.    Debrabandere also stated: "I am encouraged by the continued growth of our business, despite the changing market dynamics we experienced in the first quarter […].  During this quarter, our business completed the transition from Ovation® to BIO4 and also successfully adjusted to the CMS bundled-payment system inclusion of Grafix.  The wound care business continues to gain momentum, supported by the expansion of Medicare, Medicaid and commercial insurance coverage."

134.    On May 11, 2015, the Company filed a Form 10-Q with the SEC for the first quarter of 2015 that discussed the financial results expressed in the May 8, 2015 press release and assured investors that "[t]here [had] not been any changes in [the Company's] internal control over financial reporting that occurred during the quarter ended March 31, 2015 that [had] materially affected, or [was] reasonably likely to materially affect, [the Company's] internal control over financial reporting."

135.    The Form 10-Q filed on May 11, 2015 also contained the following statement regarding the Company's disclosure controls and procedures:

> *Evaluation of Disclosure Controls and Procedures*. An evaluation of the effectiveness of the design and operation of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended), as of the end of the period covered by this Quarterly Report on Form 10-Q was made under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (a) are effective to ensure that information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is timely recorded, processed, summarized and reported and (b) include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

136.    The Company's May 11, 2015 Form 10-Q also disclosed the following: "During the first fiscal quarters of fiscal 2015 and 2014, revenues from one of the distributors of our Biosurgery products, Stability Biologics, comprised approximately 13% and 15%, respectively, of our total Biosurgery product revenues." The Company's claim that revenues from Stability Biologics comprised approximately 15% of total Biosurgery revenues in the first fiscal quarter of 2014 directly contradicts the Company's earlier claim in its May 12, 2014 Form 10-Q for the first

fiscal quarter of 2014, wherein it attributes approximately 58% of its total Biosurgery revenues to Stability Biologics.

137.    The press release and the May 11, 2015 Form 10-Q described above contained statements that were materially false and misleading, and/or failed to disclose the following relevant facts: (a) the Company's internal controls over financial reporting were ineffective and inadequate beginning at least as early as December 2014 and remained so despite Defendants knowledge of the deficiencies; (b) as a result of the deficiencies in its internal controls, the revenues that Company reported from contracts with its distributors were inflated and inaccurate; and (c) the statements issued by Defendants regarding the Company's present performance and future outlook were materially false and misleading, and/or lacked a reasonable basis.  Product revenues for Q1 2015, which the Company claimed to be $21 million, were in fact only $19.2 million, or 8.5% less than stated; income from continuing operations which the Company claimed to be $1.4 million, were in fact only $484,000, or 64.4% less.

138.    On August 5, 2015, the Company issued a pass release entitled *Osiris Therapeutics Announces Second Quarter 2015 Financial Results*.  This press release presented the following "Highlights and Recent Developments":

- Increased product revenue for the quarter to $23.7 million - a 78% increase over Q2 2014 and a 13% increase over previous quarter.

- Increased coverage for Grafix® to 123 million lives, an increase of 25 million lives compared to the previous quarter.

- Published seven peer reviewed manuscripts, including data on a prospective study of Grafix in chronic venous ulcers.

- Initiated preparations for a Phase III confirmatory study in venous ulcers with the goal to prepare a supplemental BLA for that indication.

- Invested further in the expansion of the commercial infrastructure, including the addition of sales and marketing professionals and

establishment of an internal hotline and insurance verification department.

- Completed the quarter with after-tax income from operations of $1.2 million or $0.03 per share and with $103 million in total assets.

139.   The press release also stated: "Research and development expenses for the second quarter of 2015 were $2.3 million, increased from the $1.1 million incurred in the second quarter of 2014.   As a result of our increased commercial activity, our selling, general and administrative expenses were $14.5 million for the second quarter of 2015, compared to $9.4 million for the same period of the prior year."

140.   Debrabandere also stated in the press release: "We remain laser focused on growing revenue and investing in our leading brands […].   Despite the expiration of pass-through status for Grafix in early January, the wound care business continues to grow revenue by double-digits.   The team has made tremendous progress in opening more accounts and increasing the number of patients treated with Grafix."

141.   On August 10, 2015, the Company filed a Form 10-Q with the SEC for the second quarter of 2015 that discussed the financial results expressed in the August 5, 2015 press release and assured investors that "[t]here [had] not been any changes in [the Company's] internal controls over financial reporting that occurred during the quarter ended June 30, 2015 that [had] materially affected, or [was] reasonably likely to materially affect [the Company's] internal controls over financial reporting."

142.   The press release and Form 10-Q described above contained statements that were materially false and misleading and/or failed to disclose the following relevant facts: (a) the Company's internal controls over financial reporting for revenue recognition were ineffective and inadequate beginning at least as early as December 2014 leading to material misstatements of revenue and remained so despite Defendants  knowledge of the deficiencies; (b) as a result of the

deficiencies in its internal controls, the revenues that the Company reported from contracts with distributors were materially inflated; and (c) the statements issued by Defendants regarding the Company's present performance and future outlook were materially false and misleading, and/or lacked a reasonable basis.  Product revenues for Q2 2015, which the Company claimed to be $23.7 million, were in fact only $22.7 million, or 4.0% less than stated income from continuing operations, which the Company claimed to be $1.2 million, were in fact only $795,000, or 31.7% less.

## THE TRUTH EMERGES

143.    On November 16, 2015, the Company disclosed that it has "determined to correct the revenue recognition for three contracts which will result in a decrease in product revenues of $1.8 million in the first quarter of 2015, a decrease in product revenue of $1.0 million in the second quarter, an increase in product revenues of $0.8 million in the third quarter of 2015 and a decrease in product revenues of $1.1 million in 2014."  Thus, three restatements were made related to distributor relationships, which completely removed about $3.1 million of sales and shifted about $3.9 million of sales between quarters.  As a result of these false accounting statements, the Company missed its revenue targets in three of the last four quarters.

144.    The November 16, 2015 Form 10-Q also included the following statement: "On occasion, customers purchase product and request that the Company store the purchased product in segregated freezers at the Company's facility.  In those cases, title passes to the customer and the customer accepts all risks associated with the purchased product.  Customers may request this service of the Company in instances where they want to ensure that supply of product is available to them and they do not have the capability to store the product themselves in special freezers at - 80 degrees Celsius."

145.    Such "bill and hold" arrangements are permitted by the SEC only rarely.  According to guidance provided on the SEC website:

The Commission has set forth criteria ["Bill and Hold Criteria"] to be met in order to recognize revenue when delivery has not occurred.  These include:

1.    The risks of ownership must have passed to the buyer;

2.    The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

3.    The buyer, not the seller, must request that the transaction be on a bill and hold basis.  The buyer must have a substantial business purpose for ordering the goods on a bill and hold;

4.    There must be a fixed schedule for delivery of the goods.  The date for delivery must be reasonable and must be consistent with the buyer's business purpose (*e.g.*, storage periods are customary in the industry);

5.    The seller must not have retained any specific performance obligations such that the earning process not complete;

6.    The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7.    The equipment [product] must be complete and ready for shipment.

146.    While the Company's recognition of its bill and hold revenues seems to satisfy some of the Bill and Hold Criteria, its disclosure in the November 16, 2015 Form 10-Q demonstrates that other Bill and Hold Criteria were disregarded.  The Company's stated reason that a buyer would request a bill and hold arrangement was that "supply of the product is available to them" in the future.  This reason shows that there was, in fact, no fixed schedule for delivery of the Company's goods as stipulated by the fourth Bill and Hold Criterion.  In addition, the requirement that the Company store the held product in "special freezers at 80 degrees Celsius" proves a specific performance obligation such that the Company's "earning process is not complete" in direct violation of the fifth Bill and hold Criterion.  The Company's disregard for

54

these two Bill and Hold Criteria in its revenue recognition shows a conscious attempt to incorrectly recognize revenues for product which, according to SEC regulations, it had not sold.

147.    The Bill and Hold Criteria were essential components of a business that attempted to book legitimate Bill and Hold sales, rarely permitted by the SEC.    Defendants' alleged ignorance of the Bill and Hold Criteria is gross negligence.  Their knowledge of the Bill and Hold Criteria demonstrates that Defendants committed fraud.

148.    On November 20, 2015, the Company filed a Form 8-K with the SEC disclosing that the Company's internal controls over financial reporting were inadequate and restating the inaccuracy of the Company's 10-Q Forms for the first and second quarters of 2015 and its Form 10-K for the 2014 fiscal year.  Pursuant to that Form 8-K:

**Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**.

(a)     Osiris Therapeutics, Inc. (the "Company") previously disclosed in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2015 ("Third Quarter 2015 Form 10-Q") that it had undertaken a review of the timing of revenue recognition under contracts with its distributors.  As a result of this review, the Company determined to correct the revenue recognition for three contracts, which resulted in a decrease in product revenues of $1.8 million in the first quarter of 2015, a decrease in product revenues of $1.0 million in the second quarter of 2015, an increase in product revenues of $0.8 million in the third quarter of 2015 and a decrease in product revenues of $1.1 million in 2014.  Each of these transactions are net of applicable cost of sales.  These corrections were reflected in the Third Quarter 2015 Form 10-Q filed with the Securities and Exchange Commission (the "SEC") on November 16, 2015.

*Restatements of Interim Quarterly Periods Ending March 31, 2015 and June 30, 2015*

While the impact of these modifications to the Company's revenue recognition practices for certain distribution contracts is immaterial to its annual financial statements for the year ended December 31, 2014, the impact on the quarterly periods ending March 31, 2015 and June 30, 2015 is material.  As a result, the Company will restate its previously issued interim financial statements for first quarter and second quarter of 2015 through the filing of amended Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015 and June 30, 2015.  These

amended quarterly reports will be filed with the SEC as soon as administratively possible. On November 16 2015, management of the Company, in consultation with the Audit Committee of the Board of Directors and the Company's independent registered public accounting firm, concluded that investors should no longer rely on the Company's previously issued financial statements for the quarterly periods ended March 31, 2015 and June 30, 2015 and on any prior earnings releases or other communications relating to such periods.

*Background*

Under US GAAP, revenue is generally recognized when persuasive evidence of an arrangement exists, delivery has occurred, the price is fixed and determinable, and collectability is probable. The Company previously recognized revenue under these three distributor contracts which was reflected in the Company's audited financial statements in its Annual Report on Form 10-K for the year ended December 31, 2014 and its unaudited financial statements in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015 and June 30, 2015.

Upon subsequent review in connection with the Company's review of its third quarter 2015 financial statements, the Company determined, in consultation with its independent registered public accounting firm, that the transactions did not meet certain conditions for revenue recognition in the fourth quarter of 2014, and the first and second quarters of 2015. For one transaction in the fourth quarter of 2014, the Company determined that the persuasive evidence of an arrangement was not met until January 2015 and the price was not fixed and determinable in the quarter that the revenues were previously recognized, nor was it determined to be fixed and determinable as of the first quarter of 2015. As a result, the Company is required to account for the contract with this distributor under the cash basis of accounting, which means that revenues are recognized when cash receipts are actually received. Correcting this revenue recognition error in one contract will result in an increase in product revenues of approximately $0.8 million, net of cost of sales, in the third quarter of 2015 and a decrease in product revenues of approximately $1.1 million, net of cost of sales, in the fourth quarter of 2014. The approximate $0.3 million difference between the $0.8 million increase in product revenues for the third quarter of 2015 and the $1.1 million decrease in product revenues in 2014 will not be included as an accounts receivable as of the end of the third quarter of 2015, but will be recorded as product revenue in future periods when and if such amounts are actually received.

The Company also sold product to the same distributor during the first quarter of 2015. The Company is also recognizing this sale on the cash basis of accounting. Correcting this revenue recognition error will result in a decrease in product revenues of approximately $0.8 million, net of cost of sales, in the first quarter of 2015. The $0.8 million of accounts receivable will not be included as an accounts receivable as of the end of the first quarter of 2015, but will be recorded as product

revenue in future periods when and if such amounts are actually received.

Also during the first quarter of 2015, the Company recognized a $0.7 million sale, net of cost of sales, to a distributor that ordered products for sale outside of the United States. During its review of all distributor contracts undertaken during the third quarter 2015 period close process, the Company also determined that revenue recognition of this first quarter 2015 transaction is appropriate in a future period when the distributor achieves full regulatory approval in the country where they will be selling the product. This determination was made because the distributor has the right to return the product if regulatory approval is not achieved.

During the third quarter of 2015, the Company received final pricing information from another distributor which showed the average price for product sales during the year. This distributor first sold product for the Company during the first quarter of 2015. The distributor has the right to sell the product at any price, as long as it is sold above a contractually set minimum price. The impact of this price adjustment was $0.3 million revenue reduction during the first quarter 2015 and $1.0 million reduction during the second quarter 2015. The revenue adjustment was offset by a reduction in costs of goods sold, commissions and fees related to that revenue. This adjustment was preliminarily recorded during the third quarter of 2015, but a determination was made to adjust previous quarters to reflect the proper impact of the adjustment to previously reported periods. The Company believes that this revenue was fixed and determinable at the time of revenue recognition during the first and second quarters of 2015 given that the contract sets an agreed-upon minimum price.

The following tables present the effects of the corrections on the Company's financial statements for the first and second quarters of 2015:

| | As Previously Reported | |
| --- | --- | --- |
| | Q1 2015 | Q2 2015 |
| Product revenues | $ 21,003 | $ 23,688 |
| Cost of product revenue | 4,609 | 5,142 |
| Gross profit | 16,394 | 18,546 |
| Selling, general, and administrative expenses | 12,911 | 14,526 |
| Income taxes expense | 612 | 367 |
| Income (loss) from continuing operations | 1,377 | 1,164 |
| Net income (loss) | 1,377 | 1,164 |
| Diluted income (loss) per share | $ 0.04 | $ 0.03 |
| Trade accounts receivable, net | $ 32,022 | $ 38,598 |

| | | | |
|---|---|---|---|
| Inventory | $ | 11,939 | $ | 13,348 |
| Total liabilities | $ | 15,128 | $ | 14,185 |
| Total stockholders' equity | $ | 86,484 | $ | 88,822 |

| | Adjustments | |
|---|---|---|
| | Q1 2015 | Q2 2015 |
| Product revenues | $ (1,788) | $ (957) |
| Cost of product revenue | (319) | — |
| Gross profit | (1,469) | (957) |
| Selling, general, and administrative expenses | (175) | (497) |
| Income taxes expense | (402) | (91) |
| Income (loss) from continuing operations | (892) | (369) |
| Net income (loss) | (892) | (369) |
| Diluted income (loss) per share | $ (0.02) | $ (0.01) |
| Trade accounts receivable, net | $ (2,860) | $ (3,817) |
| Inventory | $ 555 | $ 555 |
| Total liabilities | $ (630) | $ (1,350) |
| Total stockholders' equity | $ (2,305) | $ (3,262) |

| | Restated | |
|---|---|---|
| | Q1 2015 | Q2 2015 |
| Product revenues | $ 19,215 | $ 22,731 |
| Cost of product revenue | 4,290 | 5,142 |
| Gross profit | 14,925 | 17,589 |
| Selling, general, and administrative expenses | 12,736 | 14,029 |
| Income taxes expense | 210 | 276 |
| Income (loss) from continuing operations | 485 | 795 |
| Net income (loss) | 485 | 795 |
| Diluted income (loss) per share | $ 0.02 | $ 0.02 |
| Trade accounts receivable, net | $ 29,162 | $ 34,781 |
| Inventory | $ 12,494 | $ 13,903 |
| Total liabilities | $ 14,498 | $ 12,835 |
| Total stockholders' equity | $ 84,179 | $ 85,560 |

| | Percentage Change | |
|---|---|---|
| | Q1 2015 | Q2 2015 |
| Product revenues | (8.51)% | (4.04)% |
| Cost of product revenue | (6.92)% | 0.00% |
| Gross profit | (8.96)% | (5.16)% |
| Selling, general, and administrative expenses | (1.36)% | (3.42)% |
| Income taxes expense | (65.69)% | (24.80)% |
| Income (loss) from continuing operations | (64.78)% | (31.70)% |
| Net income (loss) | (64.78)% | (31.70)% |
| Diluted income (loss) per share | (50.00)% | (33.33)% |
| Trade accounts receivable, net | (8.93)% | (9.89)% |
| Inventory | 4.65% | 4.16% |
| Total liabilities | (4.16)% | (9.52)% |
| Total stockholders' equity | (2.67)% | (3.67)% |

The preliminary revisions set forth in the table above are based on currently available information and are subject to change during the course of the Company's process to restate prior quarterly financial statements.   Until the process is complete, additional information may become available that could cause the

Company's preliminary revisions to change.

*Controls and Procedures*

As previously disclosed in the Company's Third Quarter Form 10-Q, due to the material weakness in internal control over financial reporting described below, our management, including our Chief Executive Officer and Chief Financial Officer, re-evaluated its conclusions regarding our disclosure controls and procedures and concluded that our disclosure controls and procedures were not effective as of December 31, 2014, March 31, 2015, and June 30, 2015 solely because of the material weakness that existed at that time.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Management identified the following control deficiency that constituted a material weakness in our internal control over financing reporting that existed as of December 31, 2014, March 31, 2015, and June 30, 2015:

The Company did not design and maintain controls to ensure that (1) adequate written documentation existed for contracts with distributors in order to ensure that persuasive evidence of the contractual arrangement existed and the terms were fixed and determinable with respect to revenue recognition and (2) adequate analysis and documentation existed for new distributor contracts to ensure timely and accurate recording of revenue in accordance with GAAP.

Management has concluded that this material weakness, if un-remediated, could have, in future reporting periods, resulted in a material misstatement to the Company's annual or interim consolidated financial statements that would not have been prevented or detected by its internal controls. Accordingly, management has determined that this control deficiency constituted a material weakness. Management's report on internal controls over financial reporting for the year ended December 31, 2014 should no longer be relied upon. Additionally, the opinion of our independent registered public accounting firm on the effectiveness of the Company's internal controls over financial reporting as of December 31, 2014 should no longer be relied upon.

The Company's management is implementing certain enhancements and remedial measures to its internal control over financial reporting to specifically ensure that adequate written documentation and related controls exist for proper accounting of distributor contracts. They will continue to monitor the effectiveness of these processes, procedures and controls and will make any further changes deemed appropriate.

149.    In the fiscal quarter of 2015, the Company reported product revenues of $21 million

when in fact they were only $19.2 million ($1.8million or 8.51% less); gross profits of $16.4 million when in fact they were only $14.93 million ($1.47 million or 8.96% less); diluted income per share of $0.04 when in fact it was only $0.02, or 50.00% less; net trade accounts receivable of $32 million when in fact they were only $29.16 million ($2.86 million or 8.93% less), and total stockholders' equity of $86.48 million when in fact it was only $84.18 million ($2.3 million or 2.67% less).

150.    In the second fiscal quarter of 2015, the Company reported product revenues $23.7 million when in fact they were only $22.7 million ($957,000 or 4.04% less); gross profits of $18.55 million when in fact they were only $17.6 million ($957,000 or 5.16% less); diluted income per share of $0.03 when in fact it was only $0.02, or 33.33% less; net trade accounts receivable or $38.6 million when in fact they were only $34.78 ($3.82 million or 9.89% less); and total stockholders' equity of $88.82 million when in fact it was only $85.56 million ($3.26 million or 3.67% less).

151.    On December 14, 2015, the Company received written notice of BDO's resignation, effective the same day, as its independent public accounting firm.  It was announced that BDO "advised that their opinion on the effectiveness of the Company's interim controls over financial reporting as of December 31, 2014, should no longer be relied upon due management's identification of a material weakness in internal controls over financial reporting related to the timing of revenue recognition under certain distribution contracts."

152.    On February 1, 2016, Debrabandere -- who served as the Company's President, CEO, and Board Director -- resigned from the Company.

153.    On March 15, 2016, the Company announced that it had received subpoena from the SEC, which is conducting a non-public investigation relating to the Company's historic

accounting practices.

154.    On March 17, 2016, the Company received a deficiency notice from NASDAQ informing the Company that it had not timely filed its annual report on Form 10-K for the 2015 fiscal year and that the Company would be delisted from the stock exchange should it fail to submit a plan to regain compliance within the following 60 days,

155.    On May 12, 2016, the Company received another notice from NASDAQ informing the Company that it had not timely filed its quarterly report on Form 10-Q for the first fiscal quarter of 2016 and that this represented an additional basis for non-compliance with NASDAQ listing requirements.

156.    On May 24, 2016, NASDAQ granted the Company an exemption to the NASDAQ Listing Rule, extending the deadline for the delinquent documents filing to September 12, 2016.

157.    On May 27, 2016, the Company disclosed in a regulatory filing that it is the subject of a criminal investigation by the U.S. Attorney's Office for the Southern District of New York, The Company said it believes the investigation is regarding the same matters as the SEC's "non-public investigation" disclosed in March into its accounting practices.

158.    On August 12, 2016, the Company received a letter from the NASDAQ noting that the Company had not filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 with the SEC by its due date, in compliance with NASDAQ Listing Rule 5250(c)(1), which requires that NASDAQ-listed companies file their periodic financial reports with the SEC on a timely basis.

159.    On September 16, 2016, the Company received a letter from the Listing Qualifications Department of the NASDAQ, stating that unless the Company requests a hearing before a NASDAQ Listing Qualifications Panel by September 21, 2016, the Company's common

stock would be subject to delisting based upon the Company's current non-compliance with NASDAQ Listing Rule 5250(c)(1) as a result of certain delinquent SEC reports.  On September 21, 2016, the Company requested an appeal of the NASDAQ Staff determination, and also requested a further stay of delisting.

160.    On October 6, 2016, the Company received a letter from NASDAQ's Office of General Counsel stating that a NASDAQ Hearings Panel had granted the Company's request for a stay of the delisting of the Company's common stock until such time as the NASDAQ Hearings Panel makes a decision on the merits following a hearing, which hearing has been scheduled for November 10, 2016.  The letter further stated that the Company's common stock will continue to trade on the NASDAQ Stock Market pending the November 10, 2016 hearing and the issuance of a final decision by the NASDAQ Hearings Panel thereafter.

161.    On November 15, 2016, the Company received a letter from the NASDAQ noting that the Company had not filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 with the SEC by its due date, in compliance with NASDAQ Listing Rule 5250(c)(1), which requires that NASDAQ-listed companies file their periodic financial reports with the SEC on a timely basis.

162.    On December 1, 2016, the Company received a decision letter from NASDAQ's Office of General Counsel stating that the Hearings Panel has granted the Company's request and, accordingly, the Company's common stock will continue to trade on the NASDAQ Stock Market provided that the Company becomes current in its periodic filings with the SEC on or before March 10, 2017.  The letter stated that March 10, 2017 represents the full extent of the Hearing Panel's discretion to grant continued listing while the Company is non-compliant.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

163.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

164.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

165.    Plaintiffs are current owners of Osiris stock and have continuously been owners of Osiris stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

166.    The Board consists of Defendants Friedli, Moyes, Huwyler, and Brandt.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

167.    The Board is currently comprised of four (4) members – Friedli, Moyes, Huwyler and Brandt.  Thus, Plaintiffs are required to show that a majority of Defendants, *i.e.*, two (2), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

168.    Defendants Friedli, Moyes and Huwyler face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants Friedli, Moyes and Huwyler had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

169.    Defendants Friedli, Moyes and Huwyler either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

170.    Defendants Friedli, Moyes and Huwyler cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

171.    Defendants Friedli, Moyes and Huwyler approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

172.    Defendants Friedli, Moyes and Huwyler authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

173.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants Friedli, Moyes and Huwyler are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action.

174.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Friedli

175.    Friedli is not disinterested or independent, and therefore, is incapable of considering demand because Friedli owns 14,810,455 shares of the Company stock or 43.1% of all the outstanding shares.

176.    Because of Friedli's large stake in Osiris and for other reasons as alleged herein, Friedli is not independent and cannot and should not be tasked and trusted to determine the independence of himself and the other directors.  As a major shareholder, particularly one owning a substantial portion of the Company's stock, Friedli had control of the selection of the other directors.  The fact of Friedli's position as an overwhelmingly dominant shareholder is sufficient to support a conclusion that Friedli dominates the Board, whoever its members might be, and therefore that a demand on those directors to sue the stockholder that put them in their positions would be futile.

177.    During the third quarter of fiscal 2011, the Company entered into a contract research agreement with Prolexys Pharmaceuticals, Inc. under which the Company is conducting for Prolexys an early stage clinical trial investigating a novel compound as a product candidate for cancer therapeutics.  The contract was filed as an exhibit to and discussed in a Current Report on Form 8-K filed by the Company with the SEC primarily because of the related nature of the management and ownership of Prolexys with the Company and the Company's management and with certain of significant stockholders of the Company.

178.    Prolexys is 35.7% owned by BIH SA, which owns 7.7% of the Company's outstanding common stock; 24.3% owned by Friedli; and 13.8% owned by Venturetec, Inc., which

holds 11.9% of the Company common stock.  Friedli is the President and an approximately 2%

owner of Venturetec, Inc.  Friedli has also recently reported the acquisition of a convertible bond

that would entitle him, upon conversion, to acquire an additional approximately 19% interest in

Venturetec, Inc.  Huwyler owns less than 1% of Prolexys and serves on its Board.

**Defendant Moyes**

179.    Moyes is the Chairman of the Audit Committee.

180.    During the Relevant Period, Moyes served as the Chairman or the Audit

Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit

Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting

processes of the Company and the audits of the financial statements of the Company.  Specifically,

the members of the Audit Committee are required to: (i) review the type and presentation of

information to be included in the Company's earnings press releases, as well as financial

information and earnings guidance provided by the Company to analysts and rating agencies, (ii)

review the adequacy and effectiveness of the Company's accounting and internal control policies

and procedures on a regular basis, and (iii) review the adequacy of the Company's independent

auditor.  Moyes breached his fiduciary duties of due care, loyalty, and good faith, because the

Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure

that adequate internal controls were in place regarding the serious accounting issues and

deficiencies described above. Therefore, Moyes face a substantial likelihood of liability for his

breach of fiduciary duties and any demand upon him is futile.

**Defendant Huwyler**

181.    Huwyler is a member of the Audit Committee.

182.     During the Relevant Period, Huwyler served as a member of the Audit Committee. Huwyler breached his fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above. Therefore, Huwyler face a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**Defendant Brandt**

183.     Brandt is a member of the Audit Committee.

184.     During the Relevant Period, Brandt served as a member of the Audit Committee. Brandt breached his fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above. Therefore, Brandt face a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duties)

185.     Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

186.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

187.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

188.    The preparation and dissemination of inaccurate information and SEC filings alleged herein represent a failure by Defendants to assure the existence within the Company of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting.

189.    When put on notice of internal control problems, Defendants had a fiduciary duty to promptly take appropriate action to correct the misconduct and prevent its recurrence

190.    Defendants willfully ignored obvious and pervasive problems with the Company's internal controls alleged herein and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was far too late.

191.    Defendants violated their fiduciary duty of care, loyalty, and good faith by causing or allowing the Company to disseminate to stockholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures.  These actions could not have been a good faith exercise of prudent business judgment.

192.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.  By virtue of their conduct alleged herein, Defendants engaged in intentional misconduct and knowing violations of their duties.

193.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

194.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.

Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Gross Mismanagement)

195.    Plaintiffs incorporate by reference and re-alleges each allegation contained above, as though fully set forth herein.

196.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

197.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

198.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

199.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

201.    During the Relevant Period, Defendants either received bonuses, stock options, or

similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

202.    During the Relevant Period, the non-parties named herein also received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of their bad faith conduct.  The Company should seek restitution from these non-parties and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by these non-parties due to their wrongful conduct and breach of their fiduciary duties.

203.    Further, during the Relevant Period, non-party Jacoby sold 35,947 shares of artificially inflated Company stock for proceeds of $617,062.

204.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants (and non-parties named above) and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on each and every claim set forth above.

DATED: April 5, 2018

> **NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.**
>
> By: */s/ Cynthia L. Leppert*_____
>       Cynthia L. Leppert (Bar Number 05857)
> One South Street, 27th Floor
> Baltimore, MD 21202
> Telephone: (410) 332-8554
> Facsimile: (410) 332-8594
> Email: CLL@NQGRG.com
>
> *Attorneys for Plaintiffs*

**OF COUNSEL:**

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of April, 2018, a copy of the foregoing Amended Complaint was served on the parties listed below, who are registered CM/ECF participants, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

Thomas James McKenna, Esquire
Gainey McKenna & Egleston
440 Park Avenue South, 5th Floor
New York, New York  10016
Attorney for Elizabeth A. Recupero

Andrew David Freeman, Esquire
Brown Goldstein and Levy LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland  21202-6701
Attorney for Peter Friedli

Gregory Bruch, Esquire
Bruch Hanna LLP
1099 New York Avenue, N.W.
Suite 500
Washington, DC  20001
Attorney for Peter Friedli

Scott R. Haiber, Esquire
Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, Maryland  21202
Attorney for Osiris Therapeutics, Inc.

_/s/ Cynthia L. Leppert_
Cynthia L. Leppert